UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

NEIL J. BARRETT,

                                07 CV 7945

                    Plaintiff,

        - against -

D.J. KNIGHT & COMPANY, LTD. D/B/A DJK,
D/B/A DJK RESIDENTIAL D/B/A DJ KNIGHT
RELOCATION and SIRVA RELOCATION LLC,

                    Defendants.

----------------------------------------------------------------x

SIRVA RELOCATION LLC,

                    Third-Party Plaintiff,

        - against -

CARMINE RUSSO,

                    Third-Party Defendant.

----------------------------------------------------------------x

## THIRD-PARTY COMPLAINT

        Defendant/Third-Party Plaintiff SIRVA RELOCATION LLC (hereinafter

"SIRVA") through its undersigned attorneys and pursuant to Rule 14 of the Federal Rules

of Civil Procedure, as and for its Third-Party Complaint against Third-Party Defendant

CARMINE RUSSO, alleges the following upon information and belief:

### The Parties

        1.      At all times hereinafter mentioned Defendant/Third-party Plaintiff SIRVA

is a limited liability company organized under the laws of the state of Delaware, with its

principal place of business at 6070 Parkland Boulevard, Mayfield Heights, Ohio 44124.

2.     At all times hereinafter mentioned Third-Party Defendant CARMINE

RUSSO is an individual real estate broker with a business address at 2825 Cropsey

Avenue in Brooklyn, New York 11214.

## Jurisdiction and Venue

3.     This Court has jurisdiction pursuant to §1332(a) over the original action

and there is diversity jurisdiction in this third-party action as well in that SIRVA is a

citizen of Delaware and Third-party Defendant CARMINE RUSSO is a citizen of this

state and the amount in controversy exceeds $75,000.

## Facts

4.     On or about August 9, 2007 Neil J. Barrett commenced an action in the

Supreme Court, State of New York against D.J. Knight & Company, Ltd., d/b/a DJK,

d/b/a DJK Residential d/b/a DJ Knight Relocation and SIRVA Relocation LLC for

alleged damages arising out of the rental of plaintiff's property.  SIRVA removed the

action to this Court on September 10, 2007.  A copy of plaintiff's Complaint is attached

as Exhibit 1.

5.     Plaintiff, a resident of England, alleges that he was the owner of a

condominium unit located at 2121 Shore Parkway, Apartment 7B, Brooklyn, New York

(hereinafter "the property") and that prior to 2001 he and his partner, Jose Florido,

resided at the property.

6.     Plaintiff alleges that in 2001 he was assigned to an overseas position in

London, England by his then employer, Barclays Capital, and that he and Mr. Florido

moved to England.

7.     Plaintiff alleges that Barclays Capital contracted with D.J. Knight &
Company, Ltd. to assist plaintiff in the management of the property while he was
overseas. Plaintiff alleges that pursuant to the contract D.J. Knight assigned a property
management coordinator to plaintiff who became plaintiff's advocate in the rental and
management of the property.

8.     The property was originally rented to a Patricia Rawlings, a tenant at the
property from June 1, 2001 to May 31, 2005.

9.     SIRVA purchased the assets of D.J. Knight & Company, Ltd. in and
around September 2004. In addition, SIRVA purchased the names "DJK" and "DJK
Residential" and currently uses these trade names.

10.    In or around September 2004, SIRVA took over the handling of plaintiff's
account. The same property management coordinator remained assigned to assist
plaintiff.

11.    During the time of Ms. Rawlings' tenancy she experienced a number of
roof leaks. SIRVA was advised that the condition of the roof was one of the reasons why
Ms. Rawlings decided not to renew her lease and to vacate the property.

12.    The roof leaks were occurring in other units on the same floor as the
property. The managing agent for the property, Advanced Management Services, as well
as the Board of Managers advised that they would not re-do the roof until another project
involving repairs to the balconies was completed. Instead, they were just patching up the
leaks as needed.

13.    The condition of the roof and the constant leaks from the roof was the
main reason that Ms. Rawlings did not renew the lease.

14.     After Ms. Rawlings vacated the property, SIRVA enlisted the services of a real estate broker in order to find another tenant. The property was shown to perspective tenants. SIRVA exerted its best efforts to obtain a tenant. However, because of the condition of the roof as well as the amount the plaintiff was requesting for rent, it was difficult to rent the property.

15.     In September 2005, SIRVA received notification from plaintiff that third-party defendant, CARMINE RUSSO, a real estate broker, neighbor from the building and long time family friend, had secured rental of the property effective October 1, 2005 to a Jill Gardner.

16.     CARMINE RUSSO collected funds from the new tenant in the form of two checks, one for the first month's rent in the amount $1300, and one for the security deposit in the amount of $1300. Plaintiff requested that SIRVA prepare a lease agreement for the new tenant.

17.     Ms. Gardner did not end up renting the apartment because both checks provided by her were returned due to "insufficient funds." CARMINE RUSSO advised that he would continue to look for another tenant.

18.     Thereafter, CARMINE RUSSO secured another tenant for the property. CARMINE RUSSO, acting as real estate broker for plaintiff, rented the property to Mr. Justin Goldstein and Mr. Yan Litvinov for the period of January 15, 2006 to January 14, 2006 at the rate of $1250 per month.

19.     SIRVA was not involved in renting the property to Mr. Justin Goldstein and Mr. Yan Litvinov. SIRVA did not find these tenants, did not meet with them, did not show them the property and did not negotiate the lease. The sole real estate broker for

the rental of the property to Mr. Justin Goldstein and Mr.Yan Litvinov was CARMINE RUSSO.

20.     CARMINE RUSSO did not follow the management board procedures in renting the property to Mr. Justin Goldstein and Mr. Yan Litvinov.

21.     CARMINE RUSSO did not perform credit checks on Mr. Justin Goldstein and Mr. Yan Litvinov prior to renting the property to them.

22.     CARMINE RUSSO did not verify the income of Mr. Justin Goldstein and Mr. Yan Litvinov prior to renting the property to them.

23.     CARMINE RUSSO did not obtain nor verify business or personal references for Mr. Justin Goldstein and Mr. Yan Litvinov prior to renting the property to them.

24.     CARMINE RUSSO never provided SIRVA with an executed copy of the lease agreement between plaintiff and Mr. Justin Goldstein and Mr. Yan Litvinov.

25.     Plaintiff alleges that he was notified by a letter dated February 24, 2006, from the managing agent that certain individuals had been using the fire escape as a means of gaining access to the property.

26.     Plaintiff further alleges that he was advised that the tenants, Mr. Justin Goldstein and Mr. Yan Litvinov, had connections to illegal drug activities, had been the subject of numerous break-ins into the property via the fire escape, and had been stabbed at the property by an unknown assailant, believed to be in connection with their illegal drug activities.  Shortly after discharge from the hospital, the tenants, Mr. Justin Goldstein and Mr. Yan Litvinov, vacated the property.

27.    Plaintiff alleges that he received a letter from the Board of the condominium association informing him that in leasing the property to the tenants, Mr. Justin Goldstein and Mr. Yan Litvinov, plaintiff had failed to comply with the Board approval requirements as set forth by the by-laws. Plaintiff claims he was advised that the Board was voiding the lease pursuant to the by-laws and threatening to institute legal proceedings to eject the tenants.

28.    While the tenants, Mr Justin Goldstein and Mr. Yan Litvinov, were in possession of the property, plaintiff alleges they caused extensive damage, for which plaintiff had to pay monies to the superintendent and managing agent to repair and clean the property.

29.    Prior to the apartment being cleaned and repaired, plaintiff returned to the Untied States and showed the apartment to a prospective tenant. Plaintiff alleges the prospective tenant left the property in disgust. Plaintiff alleges he hired a private contractor to clean the debris from the property and restore the premises to a rentable condition.

30.    Plaintiff alleges that despite his best efforts, the property remains vacant to date.

31.    Plaintiff brought a cause of action against SIRVA for breach of contract, promissory estoppel and negligence. Plaintiff alleges he has suffered the following damages:  (a) damage to the property; (b) pain and suffering he was subjected to as a result of uncertainty surrounding the condition of the property and viewing the property after it had been damaged, and the knowledge that a violent crime had been committed at the property; (c) six months rent for the period during which the property was vacant, and

(d) for all management fees and costs he incurred.  Plaintiff alleges his total damages is in excess of six-hundred thousand dollars ($600,000.00)

## FIRST CAUSE OF ACTION

32.     SIRVA repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "31" with the same force and effect as if fully set forth herein.

33.     If plaintiff Neil J. Barrett suffered the damages as alleged in plaintiff's Complaint, for the reasons set forth in plaintiff's Complaint, then said damages were sustained as a proximate result of the carelessness, recklessness and negligence of third-party defendant CARMINE RUSSO in acting as the real estate broker for plaintiff, in renting the property to Mr. Justin Goldstein and Mr. Yan Litvinov, in failing to follow the management board procedures in renting the property to Mr. Justin Goldstein and Mr. Yan Litvinov, in failing to perform credit checks on Mr. Justin Goldstein and Mr. Yan Litvinov prior to renting the property to them, in not verifying the income of Mr. Justin Goldstein and Mr. Yan Litvinov prior to renting the property to them, in failing to verify any business or personal references of Mr. Justin Goldstein and Mr. Yan Litvinov, in generally failing to perform any type of background check on Mr. Justin Goldstein and Mr. Yan Litvinov whatsoever prior to renting the property with them, in deeming Mr. Justin Goldstein and Mr. Yan Litvinov appropriate tenants for the property, in recommending that plaintiff rent the property to Mr. Justin Goldstein and Mr. Yan Litvinov, in negotiating the lease agreement with Mr. Justin Goldstein and Mr. Yan Litvinov and in failing to follow all procedures required for rental of the property.

34.    By reason of the foregoing, if any judgment or settlement is recovered by plaintiff against SIRVA, then SIRVA will be damaged thereby and the third-party defendant CARMINE RUSSO is or will be responsible for such damages in whole or in part.

35.    Therefore, if judgment is rendered against SIRVA, SIRVA will be entitled to contribution from third-party defendant CARMINE RUSSO for his relative responsibility or jury apportionment of fault, jointly and/or severally.  Any damages claimed by plaintiff was the sole or partial result of the carelessness, recklessness and negligence of third-party defendant CARMINE RUSSO, and SIRVA is entitled to contribution for any such damages awarded to plaintiff from third-party defendant, together with attorneys' fees, costs and expenses.

## SECOND CAUSE OF ACTION

36.    SIRVA repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "35" with the same force and effect as if fully set forth herein.

37.    If the alleged damages occurred as alleged in plaintiff's Complaint, they were the direct and proximate result of the carelessness, recklessness and negligence of third-party defendant CARMINE RUSSO.

38.    If the damages occurred as alleged in plaintiff's Complaint, they were the direct and proximate result of the carelessness, recklessness and negligence of third-party defendant CARMINE RUSSO in acting as the real estate broker for plaintiff, in renting the property to Mr. Justin Goldstein and Mr. Yan Litvinov, in failing to follow the management board procedures in renting the property to Mr. Justin Goldstein and Mr.

Yan Litvinov, in failing to perform credit checks on Mr. Justin Goldstein and Mr. Yan Litvinov prior to renting the property to them, in not verifying the income of Mr. Justin Goldstein and Mr. Yan Litvinov prior to renting the property to them, in failing to verify any business or personal references of Mr. Justin Goldstein and Mr. Yan Litvinov, in generally failing to perform any type of background check on Mr. Justin Goldstein and Mr. Yan Litvinov whatsoever prior to renting the property with them, in deeming Mr. Justin Goldstein and Mr. Yan Litvinov appropriate tenants for the property, in recommending that plaintiff rent the property to Mr. Justin Goldstein and Mr. Yan Litvinov, in negotiating the lease agreement with Mr. Justin Goldstein and Mr. Yan Litvinov and in failing to follow all procedures required for rental of the property.

39.    If plaintiff sustained any damages for the reasons set forth in plaintiff's Complaint then such damages were caused solely by the negligence, carelessness and recklessness of the third-party defendant CARMINE RUSSO.

40.    Therefore, if the plaintiff recovers from SIRVA for the damages he alleges were stained as set forth in the Complaint, SIRVA is and will be entitled to indemnification from third-party defendant CARMINE RUSSO for any verdict, settlement or judgment that plaintiff may recover against SIRVA, together with attorneys' fees, costs and expenses.

WHEREFORE Defendant/Third-party Plaintiff SIRVA demands judgment over and against Third-party Defendant CARMINE RUSSO for all or any part of any verdict or judgment that plaintiff may recover against SIRVA together with the costs, disbursements and attorneys' fees incurred in this action.

Dated: New York, New York
       September 26, 2007

DOMBROFF GILMORE JAQUES & FRENCH

By: _____
      Karen M. Berberich (KB 6300)
40 Broad Street, Suite 701
New York, New York 10004
Tel. (212) 742-8450
Fax (212) 742-0161
Attorneys for Defendant/Third-party Plaintiff
SIRVA Relocation LLC

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of September, 2007, a true and accurate copy of SIRVA Relocation LLC's Third-Party Complaint served via overnight mail addressed to the following:

Rosario DeVito, Esq.
The Law Offices of Paul J. Giacomo, Jr.
405 Lexington Avenue, 37th Floor
New York, New York 10174

_____
KAREN M. BERBERICH



COPY

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------x

NEIL J. BARRETT,

Index No.: ___01/110746___

Plaintiff,

**SUMMONS**

-against-

*Defendant's Principal Office:*
*101 Fifth Avenue, 3rd Floor*
*New York, New York 10003*

D.J. KNIGHT & COMPANY, LTD.
D/B/A DJK, D/B/A DJK RESIDENTIAL
D/B/A DJ KNIGHT RELOCATION and
SIRVA RELOCATION LLC,

*The basis of venue designated is*
*Defendant's Principal Office*

Defendants.
------------------------------------------------------------------x

To the above named Defendant(s):

**YOU ARE HEREBY SUMMONED** to answer the Verified Complaint in this action and to serve a copy of your answer, or, if the complaint is not served with the summons, to serve a notice of appearance, on the Plaintiffs' attorneys within 20 days after the service of this summons, exclusive of the date of service, or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York; and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Verified Complaint.

Dated: New York, New York
        July 17, 2004

THE LAW OFFICES OF PAUL J. GIACOMO, JR.

By:    Rosario DeVito
Attorneys for Plaintiff
405 Lexington Avenue, 37th Floor
New York, New York 10174

To:   D.J. KNIGHT & COMPANY, LTD.
D/B/A DJK, D/B/A DJK RESIDENTIAL
D/B/A DJ KNIGHT RELOCATION and
SIRVA RELOCATION LLC,
101 Fifth Avenue, 3rd Floor
New York, New York 10003

SIRVA RELOCATION LLC
c/o Corporation Service Company
80 State Street
Albany, New York 12207-2543

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------x

NEIL J. BARRETT,

        Plaintiff,

        -against-

Index No.: ___07/110746___

**VERIFIED COMPLAINT**

D.J. KNIGHT & COMPANY, LTD.
D/B/A DJK, D/B/A DJK RESIDENTIAL
D/B/A DJ KNIGHT RELOCATION and
SIRVA RELOCATION LLC,

        Defendants.
-----------------------------------------------------------------x

        Plaintiff NEIL BARRETT, by and through his attorneys, the Law Offices of Paul J.

Giacomo, Jr., as and for his Verified Complaint against the Defendants D.J. KNIGHT &

COMPANY, LTD. D/B/A DJK D/B/A DJK RESIDENTIAL D/B/A DJ KNIGHT

RELOCATION and SIRVA RELOCATION LLC, alleges as follows.

        1.      Plaintiff NEIL J. BARRETT (hereinafter sometimes "Mr. Barrett") is an

individual residing in the City of London and Country of England. Prior to 2001, Plaintiff was a

resident of the, County of Kings, City and State of New York.

        2.      Upon information and belief, Defendant D.J. KNIGHT & COMPANY, LTD.

D/B/A DJK, D/B/A DJK RESIDENTIAL D/B/A DJ KNIGHT RELOCATION (hereinafter "D.J.

Knight") is a domestic business corporation duly organized and existing pursuant to the laws of

the State of New York, with its principal place of business located at 101 Fifth Avenue, Third

Floor, New York, New York 10003.

        3.      Upon information and belief, Defendant SIRVA RELOCATION LLC (hereinafter

"SIRVA Relocation") is a foreign limited liability company organized and existing under the laws of the State of Delaware, electing New York County for purposes of venue. Upon information and belief, Defendant SIRVA Relocation LLC acquired Defendant D.J. Knight in or around September, 2004.

## FACTS COMMON TO ALL CAUSES OF ACTION

4.       On or about June 5, 2000, Plaintiff NEIL J. BARRETT purchased the condominium unit located at 2121 Shore Parkway, Apartment 7B, Brooklyn, New York (hereinafter "the Property").

5.       Prior to 2001, Mr. Barrett and his partner, Jose Florido (hereinafter "Mr. Florido") resided at the Property.

6.       During the early part of the year 2001, Mr. Barrett was assigned to an overseas position in London, England by his then employer, Barclays Capital.

7.       Mr. Florido accompanied Mr. Barrett to London, England, thereby leaving the Property vacant.

8.       Mr. Barrett decided to retain ownership of the Property, however, he did not want to leave the Property vacant and unattended.

9.       Upon information and belief, Barclays Capital contracted with Defendant D.J. Knight to assist Mr. Barrett in the management of the Property while the Plaintiff was on overseas assignment (hereinafter the "Contract") Pursuant to the Contract, D.J. Knight assigned a property management coordinator to the Plaintiff, wherein the coordinator became the

2

Plaintiff's advocate in the rental and management of the Property. Therefore, Plaintiff was an intended third party beneficiary of the Contract.

10.     On March 26, 2001, D.J. Knight sent a letter to Mr. Barrett which stated "thank you for allowing DJ Knight Relocation to assist you in the management of your property during your overseas assignment." Enclosed in the letter was a copy of the Defendant's brochure which outlined the Defendant's duties and responsibilities. Annexed hereto as **Exhibit A** is a copy of the letter dated March 26, 2001, along with a copy of Defendant's brochure.

11.     D.J. Knight promised to act as the Plaintiff's advocate in the rental and management of the Property, resulting in minimal involvement by Mr. Barrett.

12.     D.J. Knight contracted to provide the following management and marketing services:

    a.    Determining the Property's fair market rental value and developing a marketing strategy for securing the optimum tenant for the Property;

    b.    Listing the Property for rent with a qualified broker and overseeing each agent's capabilities, personnel and communications;

    c.    Establishing contact with all of the Property service providers, including local tax authorities, utility companies, on-site building management and maintenance & service companies;

    d.    Selecting tenants;

    e.    Inspecting the Property throughout the management process and providing the homeowners with relevant inspection documentation;

    f.    Administering ordinary repairs and maintenance;

    g.    Coordinating all major or extraordinary repairs (including the selection of a contractor, the monitoring of the work, and the payment of all bills) upon the consent of the Property Owner;

3

h.    Paying all relevant property expenses (including mortgage, taxes, insurance) which were sent directly to D.J. Knight; 9) Establishing a monthly rental payment schedule;

i.    Collecting the rental income and subjecting untimely rental payments to late fees;

j.    Providing the owner with relevant financial management documentation, including a monthly and annual Statement of Operations;

k.    Facilitating termination of the lease (at the end of the rental period or at the time of the owners' return); and

l     Conducting move-out inspections at each tenant's departure.

13.    The Contracted for Tenant Selection Process involved standard and customary credit checks, letter of employment and income verification, and business and personal references.

14.    Upon selection of a tenant and execution of a lease, D.J. Knight was required to send a copy of the executed lease to Mr. Barrett.

15.    D.J. Knight was responsible for physically inspecting the Property at the time of homeowner departure, at the time of tenant move-in, quarterly, at the time of tenant move-out, and at the time of homeowner return. In addition, D.J. Knight promised that inspections would be performed as needed to maintain the property in good condition.

16.    D.J. Knight was also responsible for providing Mr. Barrett with the aforementioned inspection reports. These inspection reports were to include full and complete photographic documentation, encompassing the interior and the exterior of the subject property.

17.    Upon information and belief, Defendant SIRVA Relocation acquired Defendant D.J. Knight in or around September, 2004, wherein SIRVA Relocation assumed the duties,

4

responsibilities and obligations of Defendant D.J. Knight.

18.     Defendants were also responsible for marketing the Property and ensuring that the
Property did not remain vacant. However, between June of 2005 and January of 2006, the
Property remained vacant.

19.     On or about January 15, 2006, Defendant SIRVA Relocation, acting as agent for
Mr. Barrett, executed a one-year lease (hereinafter "the Lease") with Mr. Justin Goldstein and
Mr. Yan Litvinov (hereinafter "the Tenants") at a yearly rent of $15,000.00. Annexed hereto as
**Exhibit B** is a copy of said lease dated January 15, 2006.

20.     Upon information and belief, the Defendants did not follow any of their internal
procedures as detailed in the contract under Contracted for Tenant Selection Process, as no credit
checks were performed, no letter of employment and income verification was obtained, and no
business and personal references were received.

21.     In addition, the Plaintiff did not receive a copy of the executed Lease, as required.

22.     By letter dated February 24, 2006, Mr. Barrett was notified by Advanced
Management Services, property managers for the Property, that "certain individuals said to be
from unit 7B at 2121 Shore Parkway have been using the fire escapes as a means of gaining
access to their apartments." Annexed hereto as **Exhibit C** is a copy of the letter dated February
24, 2006.

23.     In or about March, Mr. Barrett and Mr. Florido were notified via email that there
was a further problem with the Property. The Tenants, who purportedly had connections to illegal

5

drug activities, had been the subject of numerous break-ins into the Property via the fire escape. They were also informed that the Tenants had been stabbed at the Property by an unknown assailant, believed to be in connection with their illegal drug activities. Shortly after discharge from the hospital, the Tenants vacated the property.

24.    On March 20, 2006, Mr. Barrett and Mr. Florido received a letter from the Board of Managers (hereinafter "the Board") of their condominium association, the 2121 Shore Condominium, informing them that in leasing the Property to the Tenants, the Defendants failed to comply with the Board Approval requirements as laid out in Article 7 of the By-laws of the 2121 Shore Condominium (hereinafter the "By-laws"). Annexed hereto as **Exhibit D** is a copy of the letter dated March 20, 2006.

25.    In accordance with the By-Laws, the Board was voiding the lease and threatening to institute legal proceedings to eject the Tenants. The Board further threatened to hold Mr. Barrett and Mr. Florido liable for all associated costs and expenses, including but not limited to attorneys' fees, disbursements and court costs.

26.    On April 4, 2006, Ms. Julia Velez of SIRVA Relocation confirmed in an email to Mr. Barrett and Mr. Florido that Board procedures had not been followed. Annexed hereto as **Exhibit E** is a copy of the letter dated March 20, 2006.

27.    While the Tenants were in possession of the Property, they caused extensive damage to the Property.

28.    To repair the damage to the Property, the Plaintiff was required to pay $750.00 to the Defendant SIRVA Relocation. This payment was reimbursement for payment made to the

6

superintendent of the Property, Mr. Napoleon Castro, hired by the Defendant to repair and clean the Property. The Plaintiff was also required to pay $330.15 directly to Advanced Management Services, the managing agent for the Property, for the repair of damages to the Property caused by the Tenants.

29.     Believing the Property had been properly cleaned and repaired, on May 18, 2006, the Plaintiff brought a prospective tenant, who was an old friend and associate of the Plaintiff, to the Property.  The locks had been changed to prevent further entrance by the Tenants and the superintendent arrived to let the Plaintiff into the Property.

30.     The Plaintiff was horrified to find that the Property had in fact not been cleaned, to the extent that a blood-stained carpet remained on the living room floor of the Property. The Plaintiff had spent a substantial amount of money on the hardwood floors in the Property. Without the Plaintiff's permission, the Tenants had installed a light powder blue wall-to-wall carpet on the living room floor, attached at the edges with wooden frames nailed to the hardwood floors

31.     In the middle of the living room was a pile of trash left behind, including paraphernalia the Tenants had used in connection with their illegal drug activities.

32.     In addition, the glass pane of the door leading to the terrace was broken and the air conditioner installed in the lower wall was pulled half-way out and not functioning.

33.     There was another pile of garbage in the middle of the kitchen floor. The top lock latches that secure the kitchen window were broken and the mini-blind hanging in the window was also broken.

7

34.    The kitchen appliances, including the stove, oven, refrigerator, microwave, and toaster over were disgustingly filthy. All of these appliances where in good clean working order when Plaintiff last visited the apartment in June 2005.

35.    The master bathroom was filthy and the towel rack had been broken.

36.    The master bedroom contained yet another pile of garbage in the middle of the floor. In addition, there were four large holes, approximately ½ inch in diameter, drilled into the wall.

37.    After viewing the condition of the Property, the potential tenant left the premises in disgust.

38.    Shortly, thereinafter, the Plaintiff paid a private contractor to clean the debris from the Property and restore the premises to a rentable condition.

39.    Despite the Plaintiff's efforts, the Property remains vacant to date.

## AS AND FOR A FIRST CAUSE OF ACTION
## AGAINST DEFENDANTS FOR THIRD PARTY BENEFICIARY
## BREACH OF CONTRACT

40.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 39 of this Verified Complaint, as if fully set forth herein at length.

41.    The Agreement entered into by and between Barclays Capital and D.J. Knight on or about March 2001, which establishes the terms of the property management agreement, is a binding and enforceable contract between the parties.

8

42.    Although Mr. Barrett did not execute the Contract, he was an intended third-party beneficiary of the Contract. The benefit to the Plaintiff was sufficiently immediate, rather than incidental, to indicate assumption by the contracting parties of a duty to compensate the Plaintiff if the benefit is lost.

43.    Defendants have breached the terms of the Agreement by failing to select responsible Tenants in accordance with the conditions of the Contract.

44.    In addition, Defendants failed to arrange for approval by the Board of the Tenants, as required by Article 7, Selling and Leasing of Units, of the By-Laws, thereby damaging the relationship between the Plaintiff and the Board.

45.    Defendants further breached the Contract in not providing Mr. Barrett with a copy of the Lease. This breach, coupled with Defendants' failure to provide information regarding the Tenants, deprived Mr. Barrett of any opportunity to make further inquiries regarding the Tenants.

46.    Defendants further breached the Contract by failing to undertake best efforts to market and rent the Property, resulting in a six (6) month vacancy period from June, 2005, to January, 2006.

47.    As a direct and proximate result of the Defendants' breach of the Contract, Plaintiff, as third party beneficiary to the Contract, has suffered damages, including but not limited to (a) damage to the Property, (b) pain and suffering Plaintiff was subjected to as a result of uncertainty surrounding the condition of the Property and viewing the Property after it had been damaged, and the knowledge that a violent crime had been committed at the Property, (c) six (6) months rent for the period during which the Property was vacant, and (d) for all

9

management fees and costs incurred by the Plaintiff.

48.    Plaintiff is therefore entitled to recover damages from Defendants, jointly and severally, in an amount to be determined by a trier of fact, but believed to be in excess of two-hundred thousand ($200,000.00) dollars plus an award of costs, disbursements and reasonable attorneys fees incurred in the prosecution of this action.

**AS AND FOR A SECOND CAUSE OF ACTION**
**AGAINST DEFENDANTS FOR**
**PROMISSORY ESTOPPEL**

49.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 48 of this Verified Complaint as if fully set forth herein.

50.    Pursuant to the letter dated March 26, 2001, and brochure forwarded to the Plaintiff, a copy of which is annexed hereto as Exhibit A, the Defendants clearly and unambiguously promised to the Plaintiff to assist the Plaintiff in the management of the Property during his overseas assignment and to utilize their best efforts to market and manage the Property.

51.    Plaintiff reasonably and justifiably relied upon the promise by Defendants in agreeing to give up management of the Property.

52.    Plaintiff acted to his detriment in doing so, in reliance upon the promises made to him.

53.    In addition, Defendants' failure to provide any information regarding the Tenants resulted in Defendants having exclusive control over the tenant selection process.

10

54.     As a result of the reasonable and foreseeable reliance by the Plaintiff upon the representations made by the Defendants, Plaintiff suffered damages to their Property.

55.     Defendants failed to undertake best efforts to market and rent the Property, resulting in a six (6) month vacancy period from June 2005 to January of 2006.

56.     As a direct and proximate result of the reasonable reliance of the Plaintiff upon Defendants' representations to the Plaintiff's detriment, Plaintiff has suffered damages, including but not limited to (a) damage to the Property, (b) pain and suffering Plaintiff was subjected to as a result of uncertainty surrounding the condition of the Property and viewing the Property after it had been damaged, and the knowledge that a violent crime had been committed at the Property, (c) six (6) months rent for the period during which the Property was vacant, and (d) for all management fees and costs incurred by the Plaintiff.

57.     Plaintiff is therefore entitled to recover damages from Defendants, jointly and severally, in an amount to be determined by a trier of fact, but believed to be in excess of two-hundred thousand ($200,000.00) dollars, plus an award of costs, disbursements and reasonable attorneys fees incurred in the prosecution of this action.

## AS AND FOR A THIRD CAUSE OF ACTION
## AGAINST DEFENDANTS FOR NEGLIGENCE

58.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 57 as if fully set forth herein at length.

59.     Defendants had a duty to the Plaintiff under the Contract to exercise due care in the management of the Property, including but not limited to the selection of tenants and ensuring that all relevant Board regulations of the 2121 Shore Condominium were complied

11

with.

60.    Defendants breached their duty by failing to appropriately screen tenant applications to ensure that they would be suitable tenants and by failing to ensure compliance with all relevant Board regulations of the 2121 Shore Condominium.

61.    As a direct and proximate result of Defendants' negligence, Plaintiff has suffered damages, including but not limited to (a) damage to the Property, (b) pain and suffering Plaintiff was subjected to as a result of uncertainty surrounding the condition of the Property and viewing the Property after it had been damaged, and the knowledge that a violent crime had been committed at the Property, (c) six (6) months rent for the period during which the Property was vacant, and (d) for all management fees and costs incurred by the Plaintiff.

62.    Plaintiff is therefore entitled to recover damages from Defendants, jointly and severally, in an amount to be determined by a trier of fact, but believed to be in excess of two-hundred thousand ($200,000.00) dollars, plus an award of costs, disbursements and reasonable attorneys fees incurred in the prosecution of this action.

**WHEREFORE**, Plaintiff prays that judgment be entered in his favor and against the Defendants as follows:

(a)    On the First Cause of Action for an award of damages against Defendants, jointly and severally, for third party beneficiary breach of contract in an amount to be determined by the trier of fact, but believed to be in excess of two-hundred thousand ($200,000.00) dollars;

(b)    On the Second Cause of Action for an award of damages against the Defendants, jointly and severally, on the ground of promissory estoppel in an amount to be determined by the trier of fact, but believed to be in excess of two-hundred thousand ($200,000.00) dollars;

12

(c)     On the Third Cause of Action for an award of damages against

Defendants, jointly and severally, for negligence in an amount to be determined by the trier of

fact, but believed to be in excess of two-hundred thousand ($200,000.00) dollars;

Together with costs, disbursements and reasonable attorneys fees incurred in the

prosecution of this action and such other and further relief as the Court deems just and proper

under the circumstances.

Dated: New York, New York
        July 17, 2007

LAW OFFICES OF PAUL J GIACOMO, JR.

By: Rosario DeVito
Attorneys for Plaintiff
405 Lexington Avenue, 37th Floor
New York, NY  10174
212-486-0200

13

## VERIFICATION

STATE OF NEW YORK    )
                       ) ss.:
COUNTY OF NEW YORK  )

        NEIL J. BARRETT, being duly sworn deposes and says:

        1.    I am a Defendant in this action and as such am fully familiar with the facts surrounding this proceeding.

        2.    I have reviewed the foregoing VERIFIED COMPLAINT and know the contents thereof, and same are true to the best of my knowledge, information and belief except as to those matters which are alleged upon information and belief, and as to those matters I believe them to be true.

                                                NEIL J. BARRETT

Sworn to before me this
17th day of July, 2007

Notary Public

ROSARIO DEVITO
Notary Public, State of New York
No. 02DE6111292
Qualified in Kings County
Commission Expires June 7, 2008

Exhibit A

# DJKnight

March 26, 2001

Mr. Neil Barrett
2121 Shore Parkway
Apt. 7B
Brooklyn, NY 11214

Re:      Property Management

Dear Mr. Barrett:

Thank you for allowing DJ Knight Relocation  to assist you in the management of your property during your overseas assignment. I have enclosed an outline detailing our responsibilities to you as your agent, and your responsibilities as "landlord"

Enclosed please find for your review and completion the following forms:

♦   The Home Management Kit
♦   The Management Contract
♦   The Homeowner Data Sheet
♦   The Home Inventory Form

We look forward to working with you and providing you with experienced, professional assistance with the management of your home.

Please do not hesitate to give me a call with any questions or concerns you may have throughout your assignment. I may be reached on 212.367.0447 (direct dial), by facsimile 212.463.0163 or by e-mail at sossi.gulmezian@djknight.com.

Very truly yours,

Sossi Gulmezian, CRP
Property Manager

Enclosures

# DJKnight

---

**Introduction**

---

DJ Knight Relocation's mission as a full service Relocation and Real Estate Management organization, is to provide consistent client value through competitive levels of technology, quality and service, while maintaining high standards of integrity, ethical conduct and professionalism   We pursue strategies designed to foster long-term relationships with clients and design policies to promote teamwork and innovative thinking.  Our passion for becoming a leader in our industry drives our commitment to total customer satisfaction by investing in the business, people and technology necessary to meet our customer's needs.

We believe all great companies are truly measured by the quality of their people.   DJ Knight is proud to have career professionals who have worked in the industry most of their lifetime.  Our service pledge exemplifies the steadfast commitment of our people, to customer service and satisfaction. Our quality performance management system and bonus incentive program, for outstanding performance is clear indications of total management support.

DJ Knight's headquarters are centrally located on Fifth Avenue with additional offices at 654 Madison Avenue at 60th Street and 295 West Thames Street in Battery Park City, providing 24 hour a day service, 7 days a week, to meet the needs of our clients.  With trained specialists in our three New York locations, we are large enough to provide outstanding service demanded in today's competitive market and small enough to *truly* value each of our clients.

DJ Knight Relocation has set the standard in the relocation industry when it comes to the range of services we offer and the manner in which we deliver service. We have kept pace or exceeded customer demand because we continually listen to our customers through focus groups, surveys and service inquires to both the corporate client and the transferee.

# DJKnight

With over a decade of experience in the relocation and real estate environment, DJ Knight has a vast amount of expertise, pride and commitment, with the ability to comprehend the real needs of our clients. We look at ourselves as an extension of your business.

## Team Work of Professionals



DJKnight Relocation – 101 Fifth Avenue – New York, NY 10003 – 212.463.9880

# DJKnight

## Property Management

Today's mobile employees are faced with the high-pressure demands of the global marketplace. To maintain a competitive edge, corporations are also setting higher goals for success. DJ Knight's Property Management Program is adaptable to accommodate both the needs of the corporation and the employee. We recognize that the corporation must have a focused and motivated employee in the new assignment and that the employee must be confident with the management of their home, hundreds of miles away.

Regardless of the length of a business assignment, temporary or long-term, domestic or overseas, DJ Knight's National Property Management Program is offered as a viable option for the transferring employees who wish to retain their property or maintain a valuable, low cost, long term lease. Property Management is also offered as a cost-effective alternative to the home sale buy-out and/or loss-on-sale programs.

In addition to being a licensed real estate broker in the State of New York, DJ Knight Relocation has a nationwide network of real estate professionals and local independent brokers, in urban and suburban areas, specializing in property management services. Local brokers are selected based on present business relationships, industry experience and knowledge of select local area markets and professional memberships, such as the Employee Relocation Council (ERC) and the National Association of Realtors.

DJ Knight Relocation will utilize the employee's preferred agent or will select the most qualified local agent. DJ Knight continually monitors each agent's capabilities, personnel and communications. We use quality agents with numerous broker affiliations to service our customers on a national basis. With three growing locations in New York, DJ Knight has over 75 relocation brokers on staff to assist with the management of properties within the tri-state area.

When possible, the DJ Knight Property Management Coordinator performs all property inspections, completes the Property Management – Property Condition Report, takes pictures of the interior and exterior of the property and electronically remits the report and photographs to the homeowner. When a local area residential broker is utilized, the local broker performs the inspections, takes photographs and reports any defects or items requiring immediate attention. The DJ Knight Relocation Property Coordinator reviews the report and discusses any issues  The property owner is immediately advised of any concerns. The property coordinator will initiate service appraisals with the local residential broker. The local broker will be present to supervise any service matters.

# DJKnight

DJ Knight Relocation has developed general procedures for local area brokers to ensure professional standards are being maintained and that the homeowner's interests are being safeguarded.

The primary objective is to ensure that properties are effectively managed and maintained during the homeowner's absence.  This objective is achieved through creative planning and marketing by the property management coordinator and the selected rental agent in the local community.

Centralized and effective communication is essential between all parties concerned, i.e., the rental broker, homeowner and the property management coordinator, to minimize the stress and maximize the return on the homeowner's investment.

# DJKnight

## Property Management Process



Corporate Client

Employee                    DJ Knight Relocation

DJ Knight Relocation assigns a Property Management Coordinator to the employee, for the duration of the assignment. The coordinator becomes the property owner's advocate in the rental and management of the home.

| Property Owner | DJ Knight Relocation |
|---|---|
| Complete Home Kit | Contact and Counsel Homeowner |
| Market Ready Home | Provide Home Management Kit |
| | Review/discuss Property's Rental Appeal |
| | Conduct Comparative Market Analysis |
| | Determine and Recommend Rental Value |
| | Contact Property Service Providers/Lenders |
| | Review Insurance |
| | Establish Lease Requirements |
| | List Property for Rent |
| | Homeowner Departure Inspection |
| | Screen Tenants, Credit Verification |
| | Negotiate Lease, Diplomatic Clause |
| | Collect Rent(s) |
| | Tenant Move-In Inspection |
| | Tenancy Management |
| | Coordinate Repairs/Refurbishing |
| | Full Financial Management |
| | Homeowner Return |
| | Home Watch for Vacant Dwellings |
| | Ongoing Communication |

Whatever type of home, regardless of the location, DJ Knight Relocation's professional home management services will determine fair rental value, screen for the right tenant and monitor the condition of the home until your employee returns.

   

DJKnight Relocation – 101 Fifth Avenue – New York, NY 10003 – 212.463.9880

# DJKnight

**The First Step**

## Authorization / Counseling

Authorization from the corporate contact is the first step to initiating Property Management services. A property management coordinator is assigned to the relocating family to manage every aspect of the program. The property management coordinator counsels the homeowner and provides a clear understanding of the employee's new role as an *absentee landlord*.

The property management coordinator's primary responsibility is to the homeowner. Throughout the overseas assignment the employee's involvement in the property management process will be minimal. Guidelines are established to free the employee of "landlord" responsibilities, empowering the property management coordinator to act in the owner's best interest. There may be times when the homeowner is called upon for further direction, as our goal is not to remove control from the homeowner, but to give them confidence that professionals are at work for them.

## Home Management Kit

The coordinator provides the employee with our *Home Management Kit*. The kit contains comprehensive information about the program, defining the employee's responsibility as landlord and DJ Knight's responsibility as agent. The *Home Inventory* form was designed to provide the homeowner with the opportunity to list and describe remaining personal property, its condition and to set parameters for maintenance and repairs and name preferred service vendors. This form enables the property management coordinator to effectively manage repair expenses and tenant-related matters and establish lease requirements.

## Rental Appeal

The next step is to determine the property's rental appeal to the public. Employees are counseled on steps, which would bring about the highest rental value possible. Basic tips from keeping the home clean and uncluttered to using bright and cheerful lighting, in addition to low cost, cosmetic repairs - such as minor painting and fixing that faucet that's been leaking since last spring.

# DJKnight

## Comparative Market Analysis

DJ Knight Relocation will conduct a comparative market analysis of the property and obtain a broker's price opinion. A local independent broker, appraiser or professional property manager performs a professional real estate inspection. The analysis will contrast existing, available rental properties and recently leased homes to arrive at an appropriate and fair-market rental value. This information is utilized to develop an effective marketing strategy for securing the optimum tenant for the property.

## Property Service Providers

The property management coordinator establishes contact with all property service providers, to include financial institutions, local tax authority, on-site building or property management firms (where applicable), utility companies (water, gas, electricity, fuel, sewer, etc.) and maintenance/service companies (landscaping, seasonal maintenance, alarm/security system, pest control, etc.).

DJ Knight Relocation contractually requires each homeowner to carry appropriate and adequate insurance coverage, owner/landlord-tenant policy, which provides fire and vandalism coverage in addition to the standard and customary bodily injury and property damage liability. We recommend a minimum landlord liability of $1,000,000 per occurrence, and require DJ Knight to be named as an insured with the owner along with documentation of coverage. We assist the employee with obtaining appropriate coverage or work with their existing insurance carrier to effect appropriate coverage to protect the interest of the owner.

## Listing Property for Rent

Upon receipt of the executed Property Management Contract, DJ Knight Relocation will list the property for rent. DJ Knight will utilize the employee's preferred agent or will select the most qualified local agent. DJ Knight continually monitors each agent's capabilities, personnel and communications. We use quality agents with numerous broker affiliations to service our customers on a national basis. As a licensed real estate broker in the State of New York, DJ Knight has over 75 relocation brokers on staff to assist with the management of properties within the tri-state area.

# DJKnight

## Managing the Home

### Tenant Selection

The property management coordinator will thoroughly review all prospective tenant applications. In addition to the standard and customary credit check, DJ Knight Relocation requires a letter of employment and income verification, business and personal references. Once the prospective tenant's financial capabilities are determined and references are verified, the property management coordinator will negotiate the terms and conditions of the lease. When possible, DJ Knight Relocation works to secure a two to three year lease with tenants to optimize rental fees. *(Please note that the homeowner has received and reviewed the lease. Terms and conditions have been predetermined and are in compliance with local and state regulations.)* An executed copy of the lease is provided to the homeowner. DJ Knight administers the lease to ensure compliance and to protect the employee as landlord.

### Home Inspections

DJ Knight Relocation conducts a variety of professional home inspections throughout the management process. Home inspections are mandatory to ensure that the property is being well maintained. The inspections also prevent minor occurrences from developing into major problems.

- Homeowner departure inspection
- Tenant move-in inspection
- Regular quarterly inspections
- As needed for major repairs
- Tenant move-out inspection
- Homeowner return inspection

Each inspection report is completed, in writing with full and complete photographic documentation, as necessary, encompassing the interior and exterior of the subject property. The written report and photographs are electronically dispatched to the property owner.

### Repairs / Refurbishing

Many homeowners learn to live with minor inconveniences, such as leaky faucets or noisy appliances, however, tenants expect everything to be in good working order. The property management coordinator administers ordinary repairs and maintenance that are necessary to ensure that the "landlord's" obligations under the lease are being fulfilled. Repair limits are pre-established and contractually agreed upon with the homeowner. Competitive estimates are obtained for necessary repairs. The owner's written approval is obtained for repairs exceeding the repair limit. Major or extraordinary repairs or reconstruction would be coordinated by DJ Knight Relocation, upon mutual consent and on terms agreed to by the owner and DJ Knight Relocation.

# DJKnight

### Financial Management

Routine property expenses are disbursed by DJ Knight Relocation, including, but not limited to mortgage, taxes, insurance, repairs and utility payments. The rental income is collected by DJ Knight Relocation in accordance with the terms of the lease. Untimely rent payments are subject to late fees. The property management coordinator monitors receipt of rent and enforces any penalties to the tenant.

DJ Knight Relocation provides a Property Management Statement of Operations report to the property owner, monthly and at year-end. The Statement of Operations reconciles and itemizes income and expenses. Detailed documentation is provided for all expenses. In the event the report shows a credit balance in favor of the owner, DJ Knight Relocation will transmit the amount directly to a bank designated by the owner. An invoice would be provided to the owner for any balances due to DJ Knight Relocation.

### Homeowner Return

Upon notification by the corporate contact or the property owner of the anticipated return date, the property management coordinator will notify tenants, arrange for the termination of the lease and conduct a tenant's move-out inspection. In the event of an early return, the property management coordinator would exercise the diplomatic clause, as stipulated in the lease. It is, therefore, crucial that the property management coordinator is provided with ample notice of the impending return date.

During the homeowner's absence and through regular property inspections, the property management coordinator recommends periodic refurbishing to offset the effects of normal wear and tear. Necessary repairs and refurbishing, as noted in the tenant move-out and owner move-in inspection, will be reviewed with the owner and performed prior to the return date.

The property management coordinator will arrange for a final reconciliation of any receipts and disbursements.

# DJKnight

---

## Property Management

## Home Kit

---

# DJKnight

## Property Management Program

The following will outline DJ Knight Relocation's responsibilities in marketing and managing your home. Your responsibilities as absentee landlord are also provided. Please review the enclosed material and complete the forms provided.

DJ Knight Relocation's Responsibilities in Marketing and Managing your home include the following:

- ➤ **Listing and Marketing the Property:**

  - Determine and document the condition of your property upon your departure.

  - Prepare a comparative market analysis, assess your financial needs, provide a rental value report and present a range of acceptable values.

  - Select the most qualified local broker and arrange for the multiple listing of your property.

  - Create marketing strategies to facilitate the rental of your home at the maximum value.

  - Exclusively market the property in accordance with the listing agreement.

  - Tenancy Management
    - ⇒ Screen tenants
    - ⇒ Credit checks
    - ⇒ Employment verification
    - ⇒ Negotiate and prepare lease (include Diplomatic Clause)

- ➤ **Managing the Property**

  - Establish monthly maintenance expense limits and pay all bills, as you may direct, including, but not limited to the following:

    - ❑ Mortgage and taxes

    - ❑ Insurance, regardless of carrier

    - ❑ Utility payments

    - ❑ Association dues

    - ❑ Special assessments

    - ❑ Repairs and maintenance, competitive bids obtained, work monitored, bills paid.

  - Establish minor and major repair limits.

# DJKnight

- Coordinate repairs and maintenance.  Extraordinary repairs would require your expressed written consent.

- Establish a monthly rental payment schedule and collect rents.

- Collect and disperse all security deposit monies in accordance with state law.

- Pay all property invoices and maintain a separate management account for your property.

- Physically inspect your property on a quarterly basis after the initial vacancy inspection and forward-completed reports, to include photographs to you in your new location.  Additional inspections will be performed as needed to maintain your property in good condition.

- Retain service phone numbers currently used to maintain your home.

- Coordinate lease extensions, market properties and ensure timely re-rentals.

- Coordinate repatriation needs including refurbishing, transfer of payments and security deposit return.

➢ **Financial Management of the Property**

- Monthly Statement of Operations

- Year End  Statement of Operations

# DJKnight

## Property Management Program

The following will list your obligations as the property owner and absentee landlord:

> To place the home in a market-ready condition, e.g. clean home, shampoo carpets, establish a yard maintenance program, basic and cosmetic repairs that will increase your home's appeal to the public.

> Place all personal belongings in storage or have them shipped to the new location.

> In the event you elect to rent your property furnished, you will be required to provide a detailed, descriptive inventory of furnishings in your home, including values.  DJ Knight Relocation can assist you to establish this inventory.

> Provide documents of housing costs, to include:

> - tax bills
> - mortgage information
> - any routine monthly fees
> - maintenance bills
> - home insurance policy

> Provide DJ Knight Relocation with the following:

> - a set of keys.
> - a list of recommended local repair people for any plumbing, electrical, heating or other system or appliance related problems.
> - contact name and number for the Condominium Association
> - mailing addresses for all requested payments
> - arrange for all appropriate bills to be forwarded to DJ Knight for timely payment
> - signed property management agreement authorizing DJ Knight to act as your agent

Exhibit

B

Exhibit B

MAR-06-2006  14:08        DU KNIGHT SIRVA RELO

A 495—"House lease, plain English format, furnished or unfurnished, 11-78. ©

© 1978 BY JULIUS BLUMBERG, INC., PUBLISHER, NYC 10013

# LEASE AGREEMENT

The Landlord and Tenant agree to lease the Premises at the Rent and for the Term stated on these terms:

**LANDLORD:**

**TENANT:**

NEIL BARRETT & JOSE FLORIDO
C/O SIRVA RELOCATION
101 FIFTH AVENUE, 3RD FL, NEW YORK, NY  10003
Address for Notices
Same as above

JUSTIN GOLDSTEIN
YAN LITVINOV

Premises:  2121 SHORE PARKWAY, BROOKLYN, NY  11214  APT 7B

| Lease date: | Term One Year | Yearly Rent | $15,000.00 |
|---|---|---|---|
| January 15, 2006 19 | beginning  January 15, 2006 19 | Monthly Rent | $1,250.00 |
| | ending  January 14, 2007 19 | Security | $1,250.00 |

**1. Use**

The Premises must be used to live in only and for no other reason. Only a party signing this Lease, spouse and children of that party may use the Premises.

**2. Failure to give possession**

Landlord shall not be liable for failure to give Tenant possession of the Premises on the beginning date of the Term. Rent shall be payable as of the beginning of the Term unless Landlord is unable to give possession. In that case rent shall be payable when possession is available. Landlord will notify Tenant as to the date possession is available. The ending date of the Term will not change.

**3. Rent, added rent**

The rent payment for each month must be paid on the first day of that month at Landlord's Address above. Landlord need not give notice to pay the rent. Rent must be paid in full and no amount subtracted from it. The first month's rent is to be paid when Tenant signs this Lease. Tenant may be required to pay other charges to Landlord under the terms of this Lease. They are to be called "added rent." This added rent is payable as rent, together with the next monthly rent due. If Tenant fails to pay the added rent on time, Landlord shall have the same rights against Tenant as if it were a failure to pay rent.

The whole amount of rent is due and payable when this Lease is effective. Payment of rent in installments is for Tenant's convenience only. If Tenant defaults, Landlord may give notice to Tenant that Tenant may no longer pay rent in installments. The entire rent for the remaining part of the Term will then be due and payable.

**4. Notices**

Any bill, statement or notice must be in writing and delivered or mailed to the Tenant at the Premises and to the Landlord at the Address for Notices. It will be considered delivered on the day mailed or if not mailed, when left at the proper address. Any notice must be sent by certified mail. Landlord must send Tenant written notice if Landlord changes the Address for Notices.

**5. Security**

Tenant has given Security to Landlord in the amount stated above. If Tenant fully complies with all the terms of this Lease, Landlord will return the security after the Term ends. If Tenant does not fully comply with the terms of this Lease, Landlord may use the Security to pay amounts owed by Tenant, including damages. If Landlord sells the Premises, Landlord may give the Security to the buyer. Tenant will look only to the buyer for the return of the Security.

**6. Utilities and services**

Tenant must pay for the following utilities and services when billed: gas, water, electric, fuel, telephone, gardening, exterminating**

Maintenance service contracts shall be maintained, continued and paid for by Tenant. These charges will be added rent.

**7. Furnishings**

If the Premises are furnished, the furniture and other furnishings are accepted "as is." If an inventory is supplied each party shall have a signed copy.

**8. Repairs, alterations**

Tenant must keep, and at the end of the Term return the Premises and all appliances, equipment, furniture, furnishings and other personal property clean and in good order and repair. Tenant is not responsible for ordinary wear and damage by the elements. If Tenant defaults, Landlord has the right to make repairs and charge Tenant the cost. The cost will be added rent. Tenant must not alter, decorate, change or add to the Premises.

**9. Space "as is"**

Tenant has inspected the Premises. Tenant states that they are in good order and repair and takes the Premises "as is."

**10. Care of Premises, grounds**

Tenant shall keep the grounds neat and clean. Vehicles may be driven or parked only in driveways or in the garage.

**Add other utilities and services, if any.

Tenant must give Landlord immediate notice in case of fire or other damage to the Premises. Landlord will have the right to repair the damage within a reasonable time or cancel this Lease. If Landlord repairs, Tenant shall pay rent only to the date of the fire or damage and shall start to pay rent again when the Premises become usable. Landlord may cancel the Lease by giving Tenant 3 days' written notice. The Term shall be over at the end of the third day and all rent shall be paid to the date of the damage.

**12.  Liability**

Landlord is not liable for loss, expense or damage to any person or property unless it is due to Landlord's negligence. Tenant must pay for damages suffered and money spent by Landlord relating to any claim arising from any act or neglect of Tenant. Tenant is responsible for all acts of Tenant's family, employees, guests and invitees.

**13.  Landlord's consent**

If Tenant requires Landlord's consent to any act and such consent is not given, Tenant's only right is to ask the Court to force Landlord to give consent. Tenant agrees not to make any claim against Landlord for money or subtract any sum from the rent because such consent was not given.

**14.  Assignment, sublet**

Tenant may not sublet all or part of the Premises, or assign this Lease or permit any other person to use the Premises.

**15.  Landlord may enter, keys, signs**

Landlord may at reasonable times, enter the Premises to examine, to make repairs or alterations, and to show it to possible buyers, lenders or tenants. Tenant must give to Landlord keys to all locks. Locks may not be changed or additional locks installed without Landlord's consent. Doors must be locked at all times. Windows must be locked when Tenant is out. Landlord may place the usual "For Rent" or "For Sale" signs upon the Premises.

**16.  Subordination**

This Lease and Tenant's rights are subject and subordinate to all present and future (a) leases for the Premises or the land on which it stands, (b) mortgages on the leases or on the Premises or on the land, (c) agreements securing money paid or to be paid by the lender, under mortgages, and (d) terms, conditions, renewals, changes of any kind in and extensions of the mortgages or leases or Lender agreements. Tenant must promptly execute any certificate(s) that Landlord requests to show that this Lease is subject and subordinate.

**17.  Condemnation**

If all of the Premises is taken or condemned by a legal authority, the Term, and Tenant's rights shall end as of the date the authority takes title to the Premises. If any part of the Premises is taken, Landlord may cancel this Lease on notice to Tenant setting forth a cancellation date not less than 30 days from the date of the notice. If the Lease is cancelled, Tenant must deliver the Premises to Landlord on the cancellation date together with all rent due to that date. The entire award for any taking belongs to Landlord. Tenant gives Landlord any interest Tenant might have to any part of the award and shall make no claim for the value of the remaining part of the Term.

**18.  Compliance with authorities**

Tenant must, at Tenant's cost, promptly comply with all laws, orders, rules and directions of all governmental authorities, property owners associations, insurance carriers or Board of Fire Underwriters or similar group. Tenant may not do anything which may increase Landlord's insurance premiums. If Tenant does Tenant must pay the increase as added rent.

**19.  Tenant's defaults and Landlord's remedies**

    A.  Landlord may give 5 days written notice to Tenant to correct any of the following defaults:

        1.  Failure to pay rent or added rent on time.

        2.  Improper assignment of the Lease, improper subletting all or part of the Premises, or allowing another to use the Premises.

        3.  Improper conduct by Tenant or other occupant of the Premises.

        4.  Failure to fully perform any other term in the Lease.

    B.  If Tenant fails to correct the defaults in section A within the 5 days, Landlord may cancel the Lease by giving Tenant a written 3 day notice stating the date the Term will end. On that date the Term and Tenant's rights in this Lease automatically end and Tenant must leave the Premises and give Landlord the keys. Tenant continues to be responsible for rent, expenses, damages and losses.

    C.  If the Lease is cancelled, or rent or added rent is not paid on time, or Tenant vacates the Premises, Landlord may in addition to other remedies take any of the following steps:

        1.  Enter the Premises and remove Tenant and any person or property;

        2.  Use dispossess, eviction or other lawsuit method to take back the Premises.

    D.  If the Lease is ended or Landlord takes back the Premises, rent and added rent for the unexpired Term becomes due and payable. Landlord may re-rent the Premises and anything in it for any Term. Landlord may re-rent for a lower rent and give allowances to the new tenant. Tenant shall be responsible for Landlord's cost of re-renting. Landlord's cost shall include the cost of repairs, decorations, broker's fees, attorney's fees, advertising and preparation for renting. Tenant shall continue to be responsible for rent, expenses, damages and losses. Any rent received from the re-renting shall be applied to the reduction of money Tenant owes. Tenant waives all rights to return to the Premises after possession is given to the Landlord by a Court.

**20.  Bankruptcy**

If (1) Tenant assigns property for the benefit of creditors, (2) Tenant files a voluntary petition or an involuntary petition is filed against Tenant under any bankruptcy or insolvency law, or (3) a trustee or receiver of Tenant or Tenant's property is appointed, Landlord may give Tenant 30 days notice of cancellation of the Term of this Lease. If any of the above is not fully dismissed within the 30 days, the Term shall end as of the date stated in the notice. Tenant must continue to pay rent, damages, losses and expenses without offset.

**21.  Correcting tenant's default**

If Tenant fails to correct a default after notice from Landlord, Landlord may correct it for Tenant at Tenant's expense. The sum Tenant must repay to Landlord will be added rent.

**22.  Waiver of jury, counterclaim, set off**

Landlord and Tenant waive trial by a jury in any matter which comes up between the parties under or because of this Lease (except for a personal injury or property damage claim). In a proceeding to get possession of the Premises, Tenant shall not have the right to make a counterclaim or set off.

MAR-06-2006 .14:08     DJ KNIGHT STAVA RELO

**23. Written instructions**
Landlord has given or may give written instructions about the care and use of the appliances, equipment and other personal property on the Premises. Tenant must obey the instructions.

**24. Illegality**
If any part of this Lease is not legal, the rest of the Lease will be unaffected.

**25. No waiver**
Landlord's failure to enforce any terms of this Lease shall not prevent Landlord from enforcing such terms at a later time.

**26. Quiet enjoyment**
Landlord agrees that if Tenant pays the rent and is not in default under this Lease, Tenant may peaceably and quietly have, hold and enjoy the Premises for the Term of this Lease.

**27. Successors**
This Lease is binding on all parties who lawfully succeed to the rights or take the place of the Landlord or Tenant.

**28. Representations, changes in Lease**
Tenant has read this Lease. All promises made by the Landlord are in this Lease. There are no others. This Lease may be changed only by an agreement in writing signed by and delivered to each party.

**29. Paragraph headings**
The Paragraph headings are for convenience only.

**30. Effective date**
This Lease is effective when Landlord delivers to Tenant a copy signed by all parties.

**31. Late Fees:**
Rent is due on the 1st of every month. Rent received after the 5th day of the month is subject to a 5% additional fee. Return check fee are $40.00 each.

**Signatures**     The parties have entered into this Lease on the date first above stated.

**LANDLORD:**                                        **TENANT:**

STAVA RELOCATION AS AGENT FOR:                       JUSTIN GOLDSTEIN
NEIL BARRETT & JOSE FLORIDO
WITNESS:
                                                     YAN LITVINOV

| EPA and HUD Lead Paint Regulations, Effective September 6, 1996[1] |
| --- |

Landlords must disclose known lead-based paint and lead-based paint hazards of pre-1978 housing to tenants.[2] Use the following BLUMBERG LAW PRODUCTS (800 LAW MART) to comply:

3140 Lead Paint Information Booklet     3141 Lead Paint Lease Disclosure Form

[1]December 6, 1996 for owners of 1 to 4 residential dwellings.
[2]Leases for less than 100 days, 0-bedroom units, elderly and handicapped housing (unless children live there) and housing found to be lead-free by a certified inspector are excluded.

Exhibit C

Exhibit C

# AMS

## Advanced Management Services

26 Court Street
Suite 804
Brooklyn, NY 11242
Phone: (718) 852-7539
Fax: (718) 852-5312

February 24, 2006

N. Barrett & J. Florido
c/o S. Gulmezian
101 Fifth Avenue
New York, NY 11214

Re: Safety and Security
    Fire Escapes of 2121 Shore Parkway

Dear Unit Owner,

It has been brought to our attention that certain individuals said to be from unit 7B at 2121 Shore Parkway have been using the fire escapes as a means of gaining access to their apartments. This is a very serious issue as well as a bad practice for several reasons as such the building will be taking several steps to eliminate this practice.

The use of fire escapes except in the case of an emergency is a violation of the New York City Fire Code. This practice can bring attention to the building by criminal elements who may try to duplicate this in an effort to gain access to the building and can also become a safety issue.

In a response to this problem the building has re positioned the surveillance cameras to cover the fire escapes and has instituted a fine schedule as follows to be imposed on any individual who is seen violating this rule. This fine will be levied against the unit and will be placed on the unit owner's account. Additionally residents have been advised to notify the Police who are authorized to place under arrest persons trespassing on the property of 2121 Shore Parkway.

First offense: $75.00
Second offense: $150.00
Third offense: $300.00

Additionally residents have been advised to notify the Police who are authorized to place under arrest persons trespassing on the property of 2121 Shore Parkway.

Please feel free to call me if you would like to discuss this matter further. I can be reached at the above Number.

Best regards,

William Honan
Associate Property Manager

Exhibit
D



# SCHECHTER & BRUCKER, P.C.
### —— ATTORNEYS AT LAW ——

ANDREW P. BRUCKER*
HOWARD SCHECHTER
DAVID H. OSTWALD

KENNETH H. AMORELLO
LEWIS C. TAISHOFF
THOMAS V. JUNEAU, JR.†
STEPHEN M. LASSER
JOSE A. SALADIN

* LL.M. (Taxation)
† N.Y. and Conn. Bars

350 FIFTH AVENUE
EMPIRE STATE BUILDING
SUITE 4510
NEW YORK, NY 10118

TEL: (212) 244-6600
FAX: (212) 244-6784
www.sblaw.com

March 20, 2006

**BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED**
**RECEIPT NUMBER** 7160 3901 9842 6862 3106

Mr. Neil Barrett
Mr. Juan Florido
2121 Shore Parkway, #7B
Brooklyn, NY 11214

    Re:    The 2121 Shore Condominium
           Apartment:    7B
           Premises:     2121 Shore Parkway
                         Brooklyn, NY 11214
           NOTICE OF ELECTION TO VOID LEASE
           Our File No.: 22121-000

Dear Mr. Barrett and Mr. Florido:

    We are attorneys for The 2121 Shore Condominium. We have been advised that you have leased the above-referenced unit without complying with the requirements of Article 7 of the By-laws of the condominium. Pursuant to Section 7.1 of the By-laws, any purported lease "consummated in default of the applicable terms hereof shall be voidable at the sole election of the Condominium Board."

    You are hereby advised that the Board elects to void your leasing of the apartment on the basis that you neither gave notice of the intended leasing nor obtained a waiver of the Condominium's right of first refusal before putting your lessee(s) into possession. Additionally, the Board considers the individuals who are residing in the apartment to be undesirable and will exercise the right given to it by Section 7.1 "to institute legal proceedings

F:\90\22121d.90

## SCHECHTER & BRUCKER, P.C.

Mr. Neil Barrett
Mr. Juan Florido
March 20, 2006
Page 2

to eject the purported tenant" in your name unless you take immediate steps to permanently remove them from the premises.

Please also note that under Section 7.1 of the By-laws, you will be held liable for all costs and expenses paid or incurred in connection with such proceedings, including, without limitation, reasonable attorneys' fees and disbursements and court costs.

Please take immediate steps to comply and keep Lynn Tiews or William Honan at Advanced Management Services apprized of the steps you are taking and your progress.

Very truly yours,

Howard Schechter

cc:    Board of Managers
       Management
       Michelle Couperthwith, Director of Relocation
            DJK Residentials **BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED**
            **RECEIPT NUMBER    7160 3901 9842 6862 3113**

F:\90\22121d 90

Exhibit
E

## Paul J. Giacomo, Jr.

| | |
|---|---|
| **From:** | Neil.Barrett@barclayscapital.com |
| **Sent:** | Wednesday, April 05, 2006 3:34 AM |
| **To:** | Julia.Velez@sirva.com |
| **Cc:** | michellec@sirva.com; jose_florido@yahoo.com; neil_j_barrett@yahoo.com; pjg@giacomolaw.com |
| **Subject:** | RE: 2121 Shore Pkwy apt 7B |

Julia,

It will be a great relief when this person/s are out of the apartment. I think the locks should be changed and maybe from the sounds of it that the apartment might need a good clean. We had the apartment completely painted, bathrooms re-grouted and thoroughly cleaned in July when our last tenant moved out.

You should check the apartment with the inventory list that was given to you awhile ago.

So, if you are going to give back the security deposit if everything is in good order I guess they have paid up the rent until April 1, 2006 ?

As far as Carmine is concerned he's acted as a "Realtor" and he should not have anything to do with renting the apartment in the future. According to our contract, as a Barclay Capital employee the lease and Condo approval is the responsibility of DJ Knight/Sirva.

So now what happens with the renting of the apartment ?

I await your reply.

Regards,

Neil Barrett

> -----Original Message-----
> **From:** Julia Velez [mailto:Julia.Velez@sirva.com]
> **Sent:** 04 April 2006 21:35
> **To:** Barrett, Neil: Markets (LDN)
> **Cc:** Michelle Couperthwaite
> **Subject:** RE: 2121 Shore Pkwy apt 7B
>
> Neil & Jose,
>
> The tenant were suppose to move out on April 1st. When my co-worker did the inspection the apartment was in good condition and the tenants were in the process of moving. Most of their belongs were already out of the apartment.
>
> I left a message for Justin to return the keys to me at the office. Waiting to hear from him.
>
> Once I receive the keys, I will be visiting the apartment again to make sure that all is in order. I will also notify the Board that the apartment is now vacate.
>
> In regards to the Sec Dep, Justing hasn't yet requested for it to be refunded, but once I do the move-out inspection and if they is no damage to the apartment, I will refund it to the tenants.

4/5/2006

I would like your approval not to use Carmine for the re-rental of the apartment. He did not follow the Broad's procedures with this last rental which he should have been aware of. What are your thoughts on this.

*Regards,*

*Julia Velez*
*Property Manager*
*SIRVA Relocation*
*101 Fifth Avenue*
*New York, NY 10003*

*Email: <mailto:julia.velez@sirva.com>*
*Direct: (212) 367.0469*
*Main:  (212) 463.9880*
*Fax:    (212) 463.0163*

*http://www.sirva.com*

-----Original Message-----
**From:** Neil.Barrett@barclayscapital.com [mailto:Neil.Barrett@barclayscapital.com]
**Sent:** Tuesday, April 04, 2006 6:57 AM
**To:** Michelle Couperthwaite; Julia Velez
**Cc:** pjg@giacomolaw.com; neil_j_barrett@yahoo.com; jose_florido@yahoo.com
**Subject:** 2121 Shore Pkwy apt 7B

Michelle - Julia,

It is now April 4th 2006 and we have not heard anything about the tenants who were suppose to be moving out April 1.

The last email from Julia was one forwarded from the management company. We would like to know what has been going on with regards to the tenants and the property... Is the apartment empty and in the shape that it was when the tenants moved in? I am concerned by the lack of information that we have received. We do not know what transpired or .. Is the apartment ready to be rented, what happened to the deposit, what is happening with the Condo Board ..

I await a reply.

Regards,

Neil Barrett
Jose Florido


------------------------------------------------------------------------
For more information about Barclays Capital, please
visit our web site at http://www.barcap.com.

4/5/2006

Internet communications are not secure and therefore the Barclays
Group does not accept legal responsibility for the contents of this
message. Although the Barclays Group operates anti-virus programmes,
it does not accept responsibility for any damage whatsoever that is
caused by viruses being passed. Any views or opinions presented are
solely those of the author and do not necessarily represent those of the
Barclays Group. Replies to this email may be monitored by the Barclays
Group for operational or business reasons.

----------------------------------------------------------------------------------

4/5/2006

SUPREME   COURT
STATE OF NEW YORK, COUNTY OF  NEW YORK          Index No.          Year

NEIL J BARRETT,

                                        Plaintiff,

        -against-

D.J. KNIGHT & COMPANY, LTD
D/B/A DJK, D/B/A DJK RESIDENTIAL
D/B/A DJ KNIGHT RELOCATION and
SIRVA RELOCATION LLC,

                                        Defendants.

## SUMMONS AND VERIFIED COMPLAINT

### THE LAW OFFICES OF PAUL J. GIACOMO, JR.

*Attorney(s) for*

Plaintiff
*Office and Post Office Address, Telephone*

405 LEXINGTON AVENUE
37ᵀᴴ FLOOR
NEW YORK, NEW YORK 10174
212-486-0200

**To**                              Signature (Rule 130-1.1-a)

                                    _____
                                    Print name beneath

                                    Service of a copy of the within is hereby admitted.

                                    Dated: _____

**Attorney(s) for**

**PLEASE TAKE NOTICE:**

☐ **NOTICE OF ENTRY**

that the within is a *(certified) true copy of a*
duly entered in the office of the clerk of the within named court on

☐ **NOTICE OF SETTLEMENT**

that an order                                    of which the within is a true copy
will be presented for settlement to the HON          one of the judges of the
within named Court, at
on                          at              M.

Dated.

                        Yours, etc.